T.C. Memo. 2021-11

UNITED STATES TAX COURT

STEPHEN WHATLEY AND LUCILE M. WHATLEY, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6838-12.[1]                    Filed January 28, 2021.

Gregory P. Rhodes, David M. Wooldridge, Ronald A. Levitt, and Michelle

Abroms Levin, for petitioners.

Christopher A. Pavilonis, Laura A. Price, A. Gary Begun, and Denise A.

Diloreto, for respondent.

---

[1] This case is part of a larger set of cases arising from Burning Bush, LLC. Those cases are docket numbers 6267-12, 6801-12, 6835-12, 6836-12, 6837-12, 19246-12, and 13553-13. The common issue in them is the tax consequences of the partnership's donation of a conservation easement. In a separate opinion that we also release today, see Sells v. Commissioner, T.C. Memo. 2021-12, we analyze that issue. We write separately here about an issue that concerns only the Whatleys and not their partners in Burning Bush. We consolidated these cases for trial, but the parties briefed this issue separately.

**Served 01/28/21**

[*2]        MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Stephen Whatley, a proud Auburn alumnus, is a highly skilled entrepreneur who makes the tiger's share of his family's income from banking.  In the early part of this century, he bought a property in rural Alabama near his hometown and alma mater.  He then added two dozen more acres of land and formed an LLC to report his use of the property on his returns from 2004 to 2008.  He recorded very large losses for what he described as a cattle farm.  This cattle farm, however, was without cattle until at least 2008.  He now argues this cattle farm was also a tree farm.  We are left to decide whether this tree or cattle farm was a trade or business during those five tax years.  If it was, Whatley could offset some of his large banking income with his substantial farming losses.

FINDINGS OF FACT

I.      <u>Background</u>

The Whatley family has been in Lee County, Alabama for eleven generations, an almost unbroken line of farmers and ranchers.  Young Stephen Whatley was reared in Opelika.  It was here that his great-grandfather owned a 2,000-acre farm where his family raised dairy cattle, grew row crops, and grew and ginned cotton before downturns in the economy led to the property's falling

[*3] out of the family's hands. Whatley's dad's cousin also had a dairy farm that Whatley often visited. By the age of six he was getting his hands dirty tending to the row crops and picking cotton.

When he was 27, Whatley started his first business, a timber-harvesting operation. He and his partner formed a company to buy standing timber and log some of it. It proved to be more of a learning experience than a living and closed after only two years.

It turned out, however, that Whatley's real talent and vocation was banking. By the time of trial, he'd been in banking for over 43 years. After graduating from Auburn, he started at Security Pacific Bank in Los Angeles. He then moved to Atlanta and worked at the Trust Company of Georgia. After several years there, he moved back home to Lee County and worked at Colonial Bank for 25 years. In May 2006, he retired from Colonial Bank.

He did not stay idle, but instead founded a bank of his own--Southern States Bank. His reputation was good enough that he easily raised $32 million in equity. By 2016 Southern States had between $650 and $700 million in assets with Alabama branches in Huntsville, Anniston, Auburn, Opelika, Birmingham, and Sylacauga, and more branches in Georgia.

[*4]   Whatley remains actively involved in Southern States Bank as its chairman, president, CEO, and largest individual stockholder.  He travels to most of the bank's markets once every two weeks, and he works about 70 hours a week tending to this thriving business--the same strenuous schedule he started as a much younger man.

His hard work and skill led to a good income during the years at issue, even the year of the Great Recession:

| Year | AGI | Combined banking W-2 wages | Bank dividends | Sale price of bank stock |
|------|-----|----------------------------|----------------|--------------------------|
| 2004 | $369,961 | $235,466.50 | -0- | $179,421[2] |
| 2005 | 359,212 | 196,265.00 | $8,540 | 100,897[3] |
| 2006 | 1,469,567 | 124,643.86 | 14,280 | 716,859[4] |
| 2007 | 322,043 | 226,742.47 | -0- | -0- |
| 2008 | 495,361 | 229,500.00 | -0- | -0- |

[2] Whatley had basis in the sold stock that equaled the sales price, therefore no tax gain or loss was recognized.

[3] Whatley had basis in the sold stock that equaled the sales price, therefore no tax gain or loss was recognized.

[4] Whatley sold both short-term and long-term stock in 2006.  For the short-term stock--stock he held for less than a year--his basis of $221,776 equaled the sale price, therefore no tax gain or loss was recognized.  For the long-term stock that he sold for $495,083--stock he held for more than one year--he had a basis of $422,224, resulting in a long-term capital gain of $72,859.

[*5] II.     Sheepdog Farms, LLC

     A.     The Purchase

Even before he started Southern States, Whatley wanted to find an oasis from banking where he could get back to his roots and work the land.  He happened upon a 156-acre tract near Opelika, only a short drive from Auburn.  The previous owner had used the land as a timber farm and at one point had used part of it as a cattle farm.  The land was heavily forested, with 78 acres in pine and another 56 in mixed species.  It was not an active operation--and when Whatley bought it, the land was subject to the Conservation Reserve Program (CRP).[5]  Before closing, Whatley had a licensed forester come to take a look around.  The forester gave Whatley some general advice on how to care for the timber and try to make a profit from it, and she also estimated the timber's value.  Although Whatley definitely remembered being given a value for the timber, he couldn't

---

[5] The CRP authorizes the Department of Agriculture to contract with eligible land owners "whereby the land owner agrees to remove agricultural land from farm production in exchange for government payments."  Biller v. Veneman, 150 F. App'x 834, 836 (10th Cir. 2005).  The contract requires the land owner to put in place an approved conservation plan and "adhere to certain other criteria set forth in various federal statutes and regulations."  Id.  See generally 16 U.S.C. secs. 3831-3836; 7 C.F.R. pt. 1410.  The CRP program for Whatley's land prevented any timber harvesting until 2021 in exchange for annual payments of $2,841.

[*6] remember what that value was.[6]  Whatley was convinced this was the

property he wanted, and in 2003 he bought it for about $350,000.

After he bought the land, and on the advice of his longtime CPA, James

Kemp, Whatley formed Sheepdog Farms, LLC--a limited liability company that he

organized under Alabama law.  From 2004-08 Whatley was a 97% owner of

Sheepdog Farms, his wife was a 1% owner, and their children seem to have held

the rest.  But though he formed the LLC, he never transferred the land to it, and

even as of the date of trial title remained with him and his wife.

Sheepdog Farms was not to remain landless for long.  In 2004 Whatley

bought an additional 26 acres contiguous to the 156-acre tract.  This second

property came with some improvements--a 2,600-square-foot home built in 2000,

a barn, and a smaller caretaker house.  The main home is nicely done--it has a

master bedroom, two additional bedrooms with a shared bath, a great room, and a

small front room.  The barn is 5,000 square feet, large enough to bring in all the

farming equipment if a rain storm rolls through.  The caretaker house, however, is

---

[6] As of October 2016 the timber was valued at $200,000.  Since Whatley did not plan on harvesting timber until after 2021, we allowed evidence of its future value.  Estimating the market that far out is hard because the market for timber is volatile, but one expert testified that in 2022 Whatley's timber could be worth about $332,000.

[*7] around 40 years old, in poor repair, and rarely occupied. Whatley transferred title to this smaller tract to Sheepdog Farms.

### B.    Operation

Whatley had no formal business plan for the now-combined property. He did spend about 700 hours a year there during the years at issue, which averages to a bit less than 14 hours a week. When he was at the farm, his day-to-day activities varied in some ways, but usually began in the morning with a ride through the woods with a hot cup of coffee. He'd make mental notes of any work that was needed and then tend to those chores.

The farm's timber operation focused on maintenance.[7] This mostly meant that Whatley himself cleared the roads and fire lanes every year.[8] Once every few years Whatley "thinned" his property to allow additional sunlight to get down through the forest to speed the growth of the pine trees that remained. Because of the CRP, there was no timber harvesting. Whatley explained that managing pine

---

[7] Whatley testified that he consulted with other foresters after he bought the property. He was unclear on what their advice was and when he got it. He did remember that these foresters each had timber farms that sprawled over tens of thousands of acres and were very much full-time operations.

[8] Maintenance also included running a "bush hog"--a machine that is "hooked up on a power takeoff on a tractor" that has blades that "go[] behind the tractor [and] cut[] any of the understory brush."

**[*8]** trees is a long play--a product that is normally merchantable around the 30-year mark.

As to the farm's cattle operation, Whatley explained that he'd wanted to introduce cattle "from day one." Whatley testified that he consulted two cattle experts for advice, but those men managed much larger herds--600 and 1,500 head respectively--than what Whatley could reasonably expect to put on his property. Whatley, however, could not recall when this consultation took place or what advice he received. In any event, he didn't actually have cattle on his property until at least 2008, right after he learned that the IRS was going to audit him. And he explained that many of the activities that he reported as related to cattle were really activities that he undertook in preparation for cattle that would arrive sometime in the future. These included the installation of some fencing and repairs to the barn.

The administrative side of Sheepdog Farms was run with striking informality. Although it kept minimal business records like yearly trial balances and tax-asset working papers, it's not clear when these documents were created. And it kept no traditional accounting records--e.g. ledgers, balance sheets, income statements, or cashflow statements. Whatley did try to introduce some records, but they weren't entirely accurate. For example, Sheepdog Farms failed to

[*9] expense insurance that it had on the property. Sheepdog Farms didn't even have a separate bank account or any separate bank records during the years at issue.

III.    Reporting, Audit, and Trial

   A.    Reporting

When it came time to file his tax returns, Whatley turned to his long-time CPA Kemp for guidance. Sheepdog Farms filed its own return as a domestic LLC, and Whatley needed to report its activities. Kemp advised Whatley that Sheepdog Farms was a business. Kemp testified that he believed "[t]here wasn't any question about it at the time. It was a business * * * [b]ecause [Whatley] had profit motive."

Reporting Sheepdog Farms as a business meant that Kemp and Whatley had to describe Sheepdog Farms' principal business activity and principal product. This they did--their Form 1065 partnership return lists their principal business activity as "FARM" and their principal product or service as "CATTLE." This was repeated on Schedule F of the Form 1065, where again Whatley described the principal product of Sheepdog Farms as "CATTLE."

[*10] A cattle farm without cattle and a tree farm that doesn't yet harvest timber is highly likely to produce a bumper crop of losses. We summarize the Whatleys' adjusted gross income (AGI), and Sheepdog Farms' own receipts and losses here:

| Year | AGI | Schedule F gross receipts | Schedule F net loss |
|---|---|---|---|
| 2004 | $369,961 | $2,841 | $90,118 |
| 2005 | 359,212 | 2,841 | 77,442 |
| 2006 | 1,469,567 | 3,363 | 104,339 |
| 2007 | 322,043 | 2,841 | 90,378 |
| 2008 | 495,361 | 4,401 | 149,945 |
| 2009 | 265,529 | -0- | 162,747 |
| 2010 | 284,388 | 35,099 | 203,551 |
| 2011 | 225,546 | 7,941 | 176,009 |
| 2012 | 314,911 | 6,881 | 126,834 |
| 2013 | 287,196 | 5,536 | 134,265 |
| 2014 | 890,147 | 4,428 | 247,848 |
| Total | 5,283,861 | 76,172 | 1,563,476 |

We also note for the years at issue the share of these losses that were noncash expenses, primarily depreciation:

| [*11] Year | Total expenses | Total depreciation |
|---|---|---|
| 2004 | $92,959 | $22,299 |
| 2005 | 80,283 | 32,206 |
| 2006 | 107,702 | 41,151 |
| 2007 | 93,219 | 44,910 |
| 2008 | 154,346 | 49,806 |
| Total | 528,509 | 190,372 |

Many of these depreciation expenses were directly related to the two homes on the

26-acre tract that was in Sheepdog Farms' name:

| Year | Main residence | 2d home | Air conditioner | 2d air conditioner | Fireplace |
|---|---|---|---|---|---|
| 2004 | $8,198.30 | $2,106.48 | $1,725.00 | $454.25 | $70.22 |
| 2005 | 11,574.07 | 2,407.41 | 382.50 | 100.73 | 240.74 |
| 2006 | 11,574.07 | 2,407.41 | 267.75 | 70.51 | 240.74 |
| 2007 | 11,574.07 | 2,407.41 | 249.90 | 65.80 | 240.74 |
| 2008 | 7,549.03 | 2,407.41 | 249.90 | 65.81 | 240.74 |
| Total | 50,469.54 | 11,736.12 | 2,875.05 | 757.10 | 1,033.18 |

The expenses that Whatley claims on Sheepdog Farms' Schedule F that were not

related to the two homes on the 26-acre tract come from its farming activities--

most of which occurred on the 156-acre tract that Sheepdog Farms did not actually

own.

**[*12]** B.     Audit and Trial

Something about this snagged the Commissioner's attention, and in April 2008 Whatley was notified that Sheepdog Farms was under audit for tax year 2005. After he received this notice, Whatley made sure to get a forest-management plan. Cattle then also showed up on the property. The IRS then extended the audit to the Whatleys and over the next few years expanded the audit to include all the tax years from 2004 through 2008. The IRS determined to make adjustments to the Whatleys' returns, and two of these adjustments led to this litigation--the Commissioner's disallowance of the deductions from Sheepdog Farms and his disallowance of a large charitable-contribution deduction for the contribution of a conservation easement that the Whatleys donated along with several other couples.[9]

The Whatleys timely filed a petition, and we tried the case in Birmingham.[10]

---

[9] We address this deduction in <u>Sells v. Commissioner</u>, T.C. Memo. 2021-12.

[10] The Whatleys then and now are residents of Alabama, and appellate venue is presumptively in the Eleventh Circuit. <u>See</u> sec. 7482(b)(1)(A). (All section references are to the Internal Revenue Code in effect for the years at issue.)

[*13] This is a one-issue opinion: We need to decide whether Whatley's farming activity was an activity that he engaged in for profit.[11]

OPINION

I.    The Code and Regulations

Whether an activity is a trade or business is an evergreen source of tax litigation because the relevant Code sections don't draw bright lines. Section 162 allows a deduction for all ordinary and necessary business expenses, but section 183 bars any deduction for an "activity * * * [that] is not engaged in for profit." Section 183 can be hugely consequential for a taxpayer. If he doesn't engage in an activity for profit, then he can deduct section 162 expenses only to the extent of his gross income from the activity. Sec. 183(b)(2).

---

[11] The Commissioner also determined that Whatley owed accuracy-related penalties for any understatement of his tax caused by his claims to the Sheepdog losses. The parties, however, stipulated that there was no penalty-approval form for the Whatleys for the years at issue. Section 6751(b)(1) provides that "[n]o penalty * * * shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." We have definitively ruled that this means that the Commissioner must obtain written supervisory approval of the initial penalty determination no later than the date that the notice of deficiency is issued or an answer or amended answer asserting the penalty is filed. See Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; see also Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). This stipulation that he didn't obtain this written supervisory approval means no penalties here.

**[\*14]** Whether someone engages in an activity for profit should be a simple question of fact, but the question comes up so often that the field has become overgrown with factors and analogies to precedent and regulations that list more factors--all in nonexclusive lists. One of these nonexclusive lists is in a Treasury regulation that we must follow. Sec. 1.183-2(a), Income Tax Regs.; see Elliott v. Commissioner, 84 T.C. 227, 236 (1985), aff'd without published opinion, 782 F.2d 1027 (3d Cir. 1986). The regulation tells us that although the expectation of profit might not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity with the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.

It gives us nine factors to help us decide whether an activity was engaged in for profit:

- the manner in which the taxpayer carries on the activity;

- his own expertise or that of his advisers;

- the time and effort he expends on the activity;

- the expectation that assets used in the activity may appreciate in value;

- his success in carrying on similar activities;

- his history of income or losses with respect to the activity;

[*15]   ●   the amount of occasional profits, if any, from the activity;

●   his financial status; and

●   any elements of personal pleasure or recreation.

Id. para. (b).  No one factor is determinative.  Id.  We are to take all the facts and

circumstances into account, and we may give more weight to some than to others.

Id.; see Dunn v. Commissioner, 70 T.C. 715, 720 (1978), aff'd, 615 F.2d 578 (2d

Cir. 1980).

The Seventh Circuit has called this open-ended test of objective factors of

subjective intent "goofy" and has chosen not to "wad[e] through the nine factors,"

but instead to take a more holistic approach.  Roberts v. Commissioner, 820 F.3d

247, 250, 254 (7th Cir. 2016), rev'g T.C. Memo. 2014-74.  This case, though, is

appealable to the Eleventh Circuit.  So we'll trudge along the well-blazed trail and

address each specific factor, as well as any other additional facts we find important

to determine if Whatley was engaged in farming for profit.

II.   The Factors

A.   Manner in Which the Activity Is Conducted

The first factor tells us to look at how the taxpayer conducts the activity.

Sec. 1.183-2(b)(1), Income Tax Regs.; see McMillan v. Commissioner, T.C.

Memo. 2019-108, at *32.  A taxpayer who carries on his activity in a businesslike

[*16] manner and "maintains complete and accurate books and records" is more likely to be profit-minded than one who doesn't. Sec. 1.183-2(b)(1), Income Tax Regs. And if the activity is "carried on in a manner substantially similar to other activities of the same nature which are profitable," it's more likely to be a business than a pastime. Id. Abandonment of unprofitable methods likewise shows an intent to improve profitability and may indicate a profit motive. Id. To determine how this factor weighs, we will look at

- Whatley's books and records,

- his business plan,

- industry standards, and

- any adjustments he made to respond to the chronic losses he suffered.

See id.; McMillan, T.C. Memo. 2019-108, at *32-*35.

### 1. Books and Records

Complete and accurate books and records reflect a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs. But we don't look at recordkeeping just for its meticulousness, but for whether the taxpayer used his records to help him evaluate how he's doing, what expenses he might cut, and how he might increase profits. See Golanty v. Commissioner, 72 T.C. 411, 430 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981).

[*17] Whatley kept only very limited business records for Sheepdog Farms.  The record has only annual trial balances and tax-asset sheets for each year.  It is not clear when these records were created, or even whether there were any general ledger or other accounting records for Sheepdog Farms.  Whatley had no separate bank account for Sheepdog Farms, so there weren't even bank records.

Keeping so few records prevented Whatley from seeing how well--or how poorly--he was doing.  He didn't know the value of his timber when he bought the property and did not keep track of its value over time.  The absence of good records also prevented Whatley from reporting certain expenses for Sheepdog Farms, such as insurance.  He could not track Sheepdog Farms' performance.

This weighs against him.

### 2. Business Plan

A business plan suggests that an activity is conducted in a businesslike manner.  Sec. 1.183-2(b)(1), Income Tax Regs.; see Phillips v. Commissioner, T.C. Memo. 1997-128, 73 T.C.M. (CCH) 2296, 2300 (1997).  Whatley had no business plan for Sheepdog Farms.  It wasn't until July 24, 2008 that he finally got a forest-management plan.  This was four years after the he bought the property but less than four months after he learned of the IRS audit.

This factor also weighs against him.

**[*18]**     3.     <u>Industry Standard</u>

If an activity is conducted in the same way as other similar activities that are profitable, it looks more businesslike. <u>See</u> sec. 1.183-2(b)(1), Income Tax Regs. There isn't much in the record about how other tree or cattle farms are operated, but there is some.

Many of the experts that Whatley consulted had either more than 125,000 acres of timberland or hundreds of head of cattle--i.e., their operations were much larger than his. This suggests that Sheepdog Farms--with very limited acreage of timberland and no cattle until at least 2008--was not operated like similar, profitable activities. We do acknowledge that the Commissioner didn't introduce any evidence as to what a small tree farm or cattle farm would look like or that a cattle or tree farm the size of Sheepdog Farms couldn't be profitable--although we will find that a cattle farm without cattle is not likely to be profitable.

We'll be generous and call this factor neutral.

     4.     <u>Adjusting Approach</u>

Changing "operating methods, adopt[ing] * * * new techniques or abandon[ing] * * * unprofitable methods in a manner consistent with an intent to improve profitability" also indicates that a taxpayer conducted his activity in a businesslike manner. Sec. 1.183-2(b)(1), Income Tax Regs. This is a real problem

[*19] for Whatley.  During all the years at issue Sheepdog Farms operated at a substantial loss.  The facts paint no picture of rapid change to increase profitability, and Sheepdog Farms suffered greater losses as time went on.  In 2004--its first year of operation--it posted a loss of $90,000.  In nine out of the next ten years, Sheepdog Farms reported even greater losses.[12]  See supra p. 10.  Whatley took no significant steps during the years at issue to change what he was doing to cut these losses.

This factor weighs against him.

5.  Other Facts

The regulation directs us to make sure we consider all facts and circumstances.  Sec. 1.183-2(a), Income Tax Regs.  A few other relevant facts huddle beneath the "manner the activity is conducted" umbrella.  First, Whatley failed to transfer ownership of the 156-acre tract of land where most of the timber was growing to Sheepdog Farms.  This is evidence that he did not run this operation in a businesslike manner.  It also means that Sheepdog Farms claimed expenses related to land that it didn't own.

---

[12] Only in 2005 did Sheepdog Farms report a loss smaller than in 2004--a mere $77,000.

[*20] Some of the specific expenses on Sheepdog's returns are of doubtful legitimacy. During the years at issue, for example, Sheepdog Farms claimed $67,735 in depreciation for two homes on the property. It is not clear to us why depreciation of Whatley's second home--which he stated was a personal residence--and of the rarely used caretaker home should be considered business expenses.

On balance, we find that Whatley did not conduct Sheepdog Farms in a businesslike manner. This factor weighs strongly against him.

B.    Expertise of Taxpayer or Adviser

The regulation directs us to look at whether and how a taxpayer prepared for the activity in question. Sec. 1.183-2(b)(2), Income Tax Regs. It specifically directs us to check for signs that the taxpayer prepared for the activity by extensive study of its "accepted business, economic, and scientific practices, or consultation with those who are expert therein." Id. Just getting advice isn't enough--if he wants to persuade us he had a profit motive, he'd better follow that advice or tell a plausible story explaining that he's trying to develop a new or superior technique. Id.

Whatley cites his family's agrarian heritage, but he himself has no experience in running a cattle farm. Like a great many Americans who have deep

[*21] roots in our country, Whatley himself is not too far removed from ancestors who worked the land. But his forebears' experience is not his own, and their expertise is not his.

Whatley also has no experience operating a timber farm like the one at Sheepdog Farms. We do acknowledge his argument that his foray into the business at the age of 27 should weigh in his favor. But we don't think it should weigh very much--it was over 35 years ago, and his business was different. Sheepdog Farms is reportedly a timber farm. The business Whatley ran as a young man bought and logged timber that was ready to harvest. These businesses may be in the same general field, but timber harvesting and timber growing are not similar enough for us to find that Whatley had experience in the business.[13]

People who are trying to start up in a new field can also look to others to gain expertise, and Whatley also argues that he did this.

### 1. Cattle Operation

He first argues that he consulted with experienced individuals about the cattle operation. When these consultations took place is unclear. The record doesn't show whether they took place before Whatley started buying the land or

---

[13] Whatley also argues that he has experience in the field because he lends money to timber farmers through his bank. We are unconvinced. People don't go to a mechanic's banker to fix their cars--they go to a mechanic.

[*22] when he finally got cattle on the land--which was after he came under the Commissioner's eye. Whatley also didn't introduce any evidence about what actual advice he received.

2.     Timber Operation

Whatley did consult some individuals on how to manage his timber before he bought the 156-acre tract. He also sought other foresters' advice while he owned the farm. And once Whatley knew he was under audit, he did get a forest-management plan. We do not believe, however, that these consultations are enough to tip this factor in Whatley's favor, even as to Sheepdog Farms' timber operations. It is again not clear what advice he received, and it's not even clear what *type* of advice he got. The advice we look for is advice on how to profit from doing the activity in question. Heinbockel v. Commissioner, T.C. Memo. 2013-125, at *25. We find it more likely than not here that the advice Whatley received was about how to care for the timber, not how to make a profit from it. This is an important distinction here, because these advisers had very large timber farms--they totaled more than 125,000 acres--and we think it more likely than not that their advice would be less helpful in making a very small operation like Whatley's profitable. And it is not clear when Whatley got this advice. Whatley testified it was after he bought the property. But we don't know whether that means the

[*23] advice was received immediately after the purchase or after the tax years at issue.

We do believe his testimony that he consulted with a forester before he bought the land but don't think that it's enough to tip this factor in his favor. Though he got general advice about how to make a profit and care for timber, it is not clear exactly what advice the forester gave him, which makes it hard for us to determine whether Whatley followed this advice. And given his consistent sustained losses, we find it more likely than not that he didn't follow whatever advice he did receive about how to profit from his timber operation.

This factor weighs against Whatley.

### C.     Time and Effort Expended on the Activity

We next look at the time and effort a taxpayer spends on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. We usually look at three things here--devotion of a significant amount of a taxpayer's personal time (particularly if he gets no substantial amount of personal pleasure or recreation from it), withdrawal from another occupation to devote most of his energies to the activity, and employment of competent and qualified persons to carry on the activity (which can be important if a taxpayer himself doesn't spend a lot of time on the activity). Id.

[*24] This is another big problem for Whatley. He didn't leave his job as a banker to run Sheepdog Farms. He also made clear that during the years at issue he didn't hire anyone else to work on the farm.[14] This leaves us to look at whether much of Whatley's personal time was devoted to Sheepdog Farms.

We begin by observing that Whatley didn't have a whole lot of free time. He worked full time as a banker for all the years at issue--traveling and working 70 hours a week. That left him with only about 700 hours a year to work at the farm--roughly 13.5 hours a week. We find it more likely than not that Whatley was simply spending his weekends at the farm and working on the land during the day. Whatley enjoyed working at the farm.

This factor also weighs against Whatley.

D.    Expectation That Assets May Appreciate

A taxpayer's expectation that an asset may appreciate in value can show a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. There are some activities in which "an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation." Id.

---

[14] Though Tory Black--a neighbor who currently "works" (but is not paid) at Sheepdog Farms--credibly testified that he looks after the farm while Whatley isn't there, Black didn't work for Whatley during the years at issue.

[*25] This is not a factor that Whatley can cite in his favor on the cattle side of the farm. But the trees were there when he bought it, and Whatley did testify that he expected them to grow in value. But there is again a problem for him--there is nothing in the record that establishes that Whatley knew the value of the timber when he bought the place, which leads us to find it more likely than not that he did not have any justifiable hope that their growth in value would offset the costs of waiting for them to be harvested.

A big part of Whatley's problem here is that Sheepdog Farms was so spectacularly unprofitable. For the sake of argument, let's unreasonably assume the value of the timber was $0 in 2004. And let's assume the projected value of this timber in 2022 would be $332,625--the highest possible value in the record. At most, Whatley could project income of $332,625 from this timber in 2022, while his losses just from the years at issue--$512,222--already exceeded that. So even if we unreasonably assume that Whatley had a zero basis in the timber and expected the timber to sell at the highest possible value that anyone estimated, it would still produce a total loss of at least $179,597.[15] See generally Metz v. Commissioner, T.C. Memo. 2015-54, at *50-*52. This doesn't even include the

---

[15] $512,222 − $332,625 = $179,597.

[*26] losses from years 2009-14, which would increase that total loss to $1,230,851.[16]  This also assumes that Sheepdog Farms wouldn't produce yet more losses from 2015-22, which we find to be not likely at all.

This factor weighs against Whatley.

### E.    Success in Carrying on Other Similar Activities

A taxpayer's success in similar activities in the past can show that his current activity is engaged in for profit.  Sec. 1.183-2(b)(5), Income Tax Regs.  This is because "[a] track record of success in other business ventures may indicate that the taxpayer has the entrepreneurial skills and determination to succeed in subsequent endeavors."  Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *25-*26.  What's needed is some synergy between the prior business and the current activity.  See id. at *26.

Whatley again points to his old timber-harvesting business.  And we do think that Whatley's starting a business in his twenties was an early sign of the entrepreneurial inclination that he has shown all his life.  We don't doubt that it taught him some very useful general lessons about how to run a business.  But the specifics of that business were too dissimilar and too long ago for us to find that

---

[16] $1,563,476 − $332,625 = $1,230,851.

**[*27]** the skills learned in the former show by themselves that he intended to make a profit in the latter.

Sheepdog Farms is primarily a cattle farm. Whatley's old business had nothing to do with cattle at all. And growing timber is different from harvesting and logging it. But we do not want to deny some recognition of those entrepreneurial skills. We'll call this factor neutral.

> F.      History of Income and Loss

We must also look to see whether the taxpayer had a history of income or loss with this activity. Sec. 1.183-2(b)(6), Income Tax Regs. Lots of businesses lose money at the startup stage, and the regulation recognizes that a history of some losses does not necessarily mean an activity is not engaged in for profit. Id. The regulation also recognizes that there can be losses sustained because of unforeseen circumstances beyond the control of the taxpayer, "such as drought * * * or depressed market conditions." Id.

Sheepdog Farms' losses, however, are so sustained and so large that we cannot find them to be transitory or unexpected. There were losses every year from 2004-14--and the largest losses were from 2009-14. Whatley does argue that the losses for the years at issue were caused by unforeseen circumstances--specifically a drought and a depressed market. He argues that the drought caused

[*28] losses for his cattle operation and market conditions caused losses for his timber operation.

We are, however, unpersuaded that the drought caused losses for the cattle operation. The regulation tells us specifically that the event must be "unforeseen or fortuitous." Sec. 1.183-2(b)(6), Income Tax Regs. Whatley testified that there was a drought when he bought the land, which makes it neither unforeseeable nor fortuitous. The losses, moreover, were not sustained "*because of* unforeseen or fortuitous circumstances" as required by the regulation. Id. (emphasis added). The losses kept on rising even when Whatley finally bought cattle for the farm.

We are also unpersuaded that depressed market conditions caused losses for the timber operation. This argument makes little sense to us as market conditions had nothing to do with the losses Whatley sustained. Whatley didn't plan on selling timber until 2022--and we don't see how market conditions in 2004-08 would affect the value of uncut timber in 2022.

This factor weighs against Whatley.

G.      Amount of Occasional Profits, if Any

"An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." Sec. 1.183-2(b)(7),

**[\*29]** Income Tax Regs. Substantial profit, though only occasional, would serve as a sign that an activity is engaged in for profit if investment or losses are comparatively small. Id.

Sheepdog Farms in its first ten years showed no profit and only losses--and substantial ones at that.

This factor weighs heavily against Whatley.

H.  Financial Status of the Taxpayer

Substantial income from sources other than the activity--"particularly if the losses from the activity generate substantial tax benefits"--may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs. This is especially true if, as here, there are personal or recreational elements involved. Id.

Whatley has substantial income from banking. The losses from Sheepdog Farms would, if we allowed them, generate substantial tax benefits. The following table illustrates the potential tax benefits:

| Year | Banking income | Sheepdog Farms loss |
|------|----------------|---------------------|
| 2004 | $235,466.50 | ($90,118) |
| 2005 | 204,805.00 | (77,442) |
| 2006 | 211,782.86 | (104,339) |
| 2007 | 226,742.47 | (90,378) |

| [*30]    2008 | 250,000.00 | (149,945) |
| Total | 1,128,796.83 | (512,222) |

This factor weighs against Whatley.

## I.    Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs.  That doesn't mean that a business becomes a hobby just because the taxpayer enjoys it-- "suffering has never been made a prerequisite to deductibility." Jackson v. Commissioner, 59 T.C. 312, 317 (1972).  At the same time, "where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity." Dodge v. Commissioner, T.C. Memo. 1998-89, 75 T.C.M. (CCH) 1914, 1919 (quoting Burger v. Commissioner, T.C. Memo. 1985-523, 50 T.C.M. (CCH) 1266, 1272-73, aff'd, 809 F.2d 355 (7th Cir. 1987)), aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999).

That describes what was going on here.  Whatley found 182 acres of land near his hometown, and enjoyed going there as a retreat from his grueling and

[*31] time-consuming banking business.  Though many people do not find farming enjoyable, Whatley did.

This factor also weighs against Whatley.

### J.  Summary and Holistic Approach

The regulation's "goofy" factors--none of which favors Whatley and only two of which are neutral--lead us to find that Sheepdog Farms was not an activity engaged in for profit.  Judge Posner's "holistic" approach would get us there much more quickly.  Whatley was a banker working 70 hours a week.  He found this property and bought it.  This let him work outdoors--something that he did as a child and enjoyed.  But the property was a cattle farm with no cattle during all but part of one year at issue.  It had consistent and substantial losses which totaled over $1.5 million from 2004-14.  Even if he later cut and sold the timber, he had no chance of turning a profit; but Sheepdog Farms' expense, if allowed, would substantially offset his income from other sources.  That deduction is just what section 183 prevents.

## III.  Mortgage Interest

Our finding on the major issue creates a minor one.  Whatley anticipated that we might not find Sheepdog Farms to be a trade or business, and argues in the alternative that he can deduct the interest allocable to the main residence on the

**[*32]** property under section 163.[17]  We must see whether this alternative theory can take root.

A.    The Law

As a general rule, section 163(a) allows a deduction of all interest paid. Section 163(h)(1) is an exception that bars deductions of personal interest.  The Code then has an exception to the exception for "qualified residence interest." Sec. 163(h)(2)(D).  "Qualified residence interest" is any interest which is paid on "acquisition indebtedness" of any "qualified residence" of the taxpayer.  Sec. 163(h)(3)(A)(i).  Acquisition indebtedness is any indebtedness that:

- is incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer, and

- is secured by such residence.

Sec. 163(h)(3)(B)(i)(I).  A "qualified residence" is a taxpayer's residence (other than his principal residence) which he uses as a dwelling unit for personal purposes for more than 14 days during the tax year.  Secs. 163(h)(4)(A)(i)(II), 280A(d)(1).

---

[17] We overrule the Commissioner's objection to Whatley's introduction of evidence in support of this argument.

**[*33]** B.     <u>Analysis</u>

The Whatleys again have a problem.  We do not doubt that the main residence on the property is a "qualified residence."  We also do not doubt that the Whatleys used it for personal purposes more than 14 days during each year at issue.

But is the interest paid on it "acquisition indebtedness?"  "[A]cquisition indebtedness" requires that the indebtedness have been incurred to acquire a qualified residence and is secured by that residence.  Whatley introduced no paperwork about this debt.  He did testify that he had both a mortgage and a line of credit on "the farm."  On his return for 2004 Whatley reported the mortgage interest as mortgage interest and the line-of-credit interest as "other interest."  For years 2005-08, he simply deducted interest paid on both the mortgage and the line of credit as "other interest."

The problem is that only interest attributable to a qualified residence--here the main house on the farm--is deductible under section 163.  The interest deductions the Whatleys claimed on the returns were for the entire property.  Whatley testified how much interest he thought was attributable to the main residence on the farm.  But he did this without any reliable documentation, and we do not find his testimony credible.  Like the taxpayer in <u>Fine v. Commissioner</u>,

**[\*34]** T.C. Memo. 2013-248, at \*4, Whatley "failed to present any documentation or other credible evidence showing that he paid home mortgage interest."

The Whatleys can't deduct any of the interest they paid on their property.

Entry of decision requires some calculation and coordination with the entry of decisions in <u>Sells</u>, so

<u>Decision will be entered under</u>

<u>Rule 155</u>.
