THOMAS C. BURGER and MARIAN E. BURGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burger v. Commissioner
Docket No. 11731-83.
United States Tax Court
T.C. Memo 1985-523; 1985 Tax Ct. Memo LEXIS 107; 50 T.C.M. (CCH) 1266; T.C.M. (RIA) 85523; October 7, 1985. David E. Price and Steven C. Bradley, for the petitioners. Brett J. Miller and Reid M. Huey, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for 1978, 1979 and 1980 in the following amounts: Year
Deficiency
1978
$24,043.44
1979
$30,553.31
1980
$29,300.87
*109 After concessions, the issues for decision are (1) whether petitioners' dog breeding activity was an "activity not engaged in for profit" within the purview of section 183[1] and (2) if the activity was one engaged in for profit, whether certain deductions disallowed by respondent are allowable. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, Thomas C. Burger and Marian E. Burger, husband and wife, resided in Evansville, Indiana, at the time they filed their petition. At all times relevant, Thomas Burger has been a surgeon in a solo private practice, as well as the medical director (on a part-time basis) for Aluminum Company of America ("Alcoa") at their Warrick, Indiana facility. Sometime during 1973 or 1974, when Dr. Burger was 49 years of age, he discovered that he had an affliction of the right hand known as Dupuytren's Contracture, which ultimately results in the fingers being clamped down into the palm. In its *110 advanced stage, the disease would render the practice of surgery impossible. The progression of the disease is unpredictable; the loss of hand function can occur at any time from one to twenty years after onset of the affliction. When he became aware of his affliction, Dr. Burger began to plan for his eventual retirement from the private practice of medicine. He sought an activity which would allow him and his wife to work together and which could be re-established outside of the Evansville area if he and his wife were to move to a warmer climate. They decided to breed dogs because it afforded them the desired mobility and was an activity which they could do together. Having decided on this course, but without any prior experience with animal breeding [2], petitioners embarked on an educational program in which they read books and journals on the subject, attended seminars on dog breeding, and consulted with dog breeders. [3] Further, they consulted an accountant with regard to the keeping of adequate books and records, and an attorney with regard to the need for obtaining a zoning variance [4] , a kennel license, and whether or not to incorporate. *111 Petitioners decided to breed Afghan hounds under the kennel name Shantoma. Afghan hounds, when fully grown, are relatively large dogs. The show dogs have long hair on their heads, ears, bodies and legs. Afghan hounds can be bred after reaching approximately 2 years of age; the gestation period is 63 days. Top Afghans command sales prices of several thousands of dollars. After consultation with Dr. Gerda Kennedy of Shangrila Kennels, an Afghan hound breeder in Tulsa, Oklahoma, petitioners purchased three Afghan hounds from her, as follows: Date of
Purchase
Name
Type
Purchase
Price
Adhara
Female
Feb. 22, 1975
$2,000
Tutenkyor
Male
March 29, 1975
5,000
Kunasata
Female
May 10, 1975
5,000
Tutenkyor and Kunasata were each 2 years of age at the time of purchase and thus could be immediately campaigned. The value of a breeding dog derives from the dog's show reputation, its bloodline and its ability to breed. The dog's reputation is developed and cultivated on the dog show circuit. In a dog show, a dog that places well in the various competitions earns points. These points are accumulated over the dog's show career until 15 points *112 are garnered, at which time the dog is designated a champion and the dog's name is prefaced with the letters "Ch." A successful breeding program ideally includes dogs that have been "finished" to champion and that have pedigrees evidencing an ancestry of champions. When acquired, Kunasata had five points toward champion, and petitioners expected to finish and breed her within one year. Petitioners' first show with Kunasata, in Nashville in October, 1975, was disappointing. However, in their second attempt, Kunasata won Best of Breed. In May, 1976, in a competition in St. Louis, Missouri, Kunasata was finished to champion. Petitioners decided to continue showing Kunasata with the desire that she would accumulate a sufficient number of points (during 1976 or 1977) to qualify as the Best Afghan in the United States for that particular year, even though campaigning Kunasata for an additional year was anticipated to cost $20,000 and there would be a delay in her breeding. The pinnacle of Kunasata's career was reached the following February. On February 12, 1977, Kunasata was named Best of Breed at the Afghan Hound Club of America National Specialty Show, held in New York City. Three *113 days later, she repeated as Best of Breed at the Westminster Kennel Club Show, also in New York City. This double win by an Afghan bitch had never before, or since, been accomplished. Shortly before Kunasata won at the Westminster, Mrs. Burger was offered $25,000 for the animal, but the offer was declined. Pursuant to petitioners' purchase agreement for Kunasata, Dr. Kennedy had the right to provide the stud for Kunasata's first three breedings, as well as the right to select and receive the second and third puppies of the litter. When Kunasata came into season (i.e., in heat) in March, 1977, petitioners requested that Dr. Kennedy provide the stud to be bred to Kunasata; however, Dr. Kennedy did not do so. Six months later, when Kunasata next came into season, Dr. Kennedy again failed to provide the promised stud. With the breeding of Kunasata already delayed by her extended campaigning, and in view of Dr. Kennedy's repeated failure to provide the stud, petitioners bred Kunasata to their own Tutenkyor (now a champion) in March, 1978. On May 13, 1978, Kunasata whelped a litter (the 1978 litter) of 13 pups, 9 of which were born alive (six male and three female). However, during *114 the whelping, Kunasata suffered a ruptured uterus requiring a hysterectomy, thus preventing her from further breedings. Petitioners were forced by this turn of events to reassess their plans. They decided not to immediately sell the puppies from the 1978 litter, but rather to retain them for a period of time in order to evaluate which ones should be kept for eventual breeding purposes. The first sale from the 1978 litter occurred on September 21, 1979, when petitioners sold a hound to a customer in Japan, for which they received $3,000 plus shipping and related charges. Also, in 1979, petitioners gave away two dogs that neither could be used in their breeding program nor sold. In February, 1980, petitioners bred a male dog from the 1978 litter, Sarouk, to Adhara. The whelping which occurred on April 3, 1980 (the 1980 litter), produced nine pups (five female and four male). One pup from the 1980 litter died two months later of parvo virus. At this point in time, petitioners had nine Afghan hounds (the three they purchased originally and six remaining from the 1978 litter) and eight pups. During 1980, they sold one hound from the 1978 litter, Shiraz, for $2,000 and one pup, *115 Ariadne, for $700. From 1981 through 1983, they sold four of the five hounds remaining from the 1978 litter for a total of $12,250 -- Tabriz for $500, Bijar for $750, Ghiordes for $3,500, and Sarouk (after having finished him to champion) for $7,500 (thr latter two sales were to customers in Japan). The last, Bergama, was kept as petitioners' brood bitch. During these same years, they sold five of the seven hounds remaining from the 1980 litter for a total of $3,400, with prices ranging from $150 to $2,250. Petitioners owned and attempted to breed other dogs over the years. They received as a gift in 1975, a Borzoi bitch, but this dog died while en route to a show in California during the first half of 1977. They acquired for $750 on July 2, 1977, a male Shih Tzu which they intended to finish to champion. After having finished him to champion, they acquired on January 3, 1979, for $1,000, two female pups, both direct descendant's of the top Shih Tzu of all time (Akaba's Pinkerton Man). However, a genetic defect from in-breeding resulted in whelpings in late 1980 and early 1981 in which half of the pups died and almost all of those that lived had physical deformities. Only *116 one of the eight live Shih Tzu pups eventually whelped was ever of show quality. Petitioners operated Shantoma out of their home, which necessitated capital renovations to both the inside and outside of the house. In 1979, they purchased (for a room used as an office) and oriental rug for $3,550, Japanese prints for $700, and wallpaper for $240, as well as other items, which they deducted as a business expense. Additionally in 1980, they purchased (for the outside) urns, concrete statutes, and a concrete Buddha for $1,034.50, and an oriental iron gate for $1,271.80, as well as various electrical appliances, which they claimed as a business expense. Although their house was located in a residential area petitioners did not seek a zoning variance. Further, they did not license any of their dogs despite an ordinance requiring animal licensing, nor did they seek a license to run a kennel. To facilitate their extensive travel to various shows, petitioners purchased a motor home which was used exclusively in relation to the dog breeding activity and which they converted to accommodate their needs. The amount of time Dr. Burger was able to devote to Shantoma varied over the years *117 due to the demands of his medical practice and his employment with Alcoa.Nevertheless, he undertook the routine care of the animals in the early morning and evening hours and on the weekends. Mrs. Burger testified that she devoted most of her waking hours to petitioners' dog breeding activities. Petitioners each attended over 20 seminars on dog breeding and between 400 and 500 dog shows. Often the dog shows included social affairs for the participants. In addition to petitioners' operation of Shantoma, they held offices in various kennel clubs. Shantoma's financial records consisted of a ledger into which entries were made at the end of each year from bills and receipts accumulated throughout the year. It was maintained by the office manager of Dr. Burger's medical office both during her working day and on her own time. She received no compensation for this service beyond that which she received from the medical practice for her normal duties. The bookkeeping system employed for Shantoma was not as sophisticated as that maintained for the medical practice, which included daily, weekly, and monthly posting in a double entry ledger, financial statements, and computer generated *118 balance sheets. Rather, the system used for Shantoma merely listed revenues and expenses under appropriate headings; it did not permit an analysis to be made as to the costs incurred for each dog, nor did it permit periodic assessment of the ongoing profitability of Shantoma's activities. Petitioners did not maintain a separate checking account for Shantoma. Instead, checks for Shantoma were drawn on their personal checking account; those that were written for Shantoma were clearly identified as such. Petitioners did not maintain a telephone directory listing for Shantoma nor did they maintain insurance coverage on any of the dogs. Dr. Burger's wages from Alcoa, his net earnings from his medical practice, and his gross receipts and expenses from Shantoma for the years 1975 through 1980 are as follows: Alcoa
Medical Net
Gross Receipts
Expenses
Wages
Earnings
(Shantoma)
(Shantoma)
1975
$26,775.00
$79,064.68
$0     ($13,702.00)
1976
30,797.30
90,831.44
0     (26,098.00)
1977
31,254.42
69,408.93
0     (48,299.06)
1978
32,504.42
85,070.61
0     (46,374.24)
1979
35,105.77
93,049.59
4,650.00
(59,249.11)
1980
37,676.48
108,937.74
3,890.21
(54,596.31)
*119 Respondent disallowed the deductions claimed by petitioners in 1978, 1979 and 1980 for their dog breeding activity since he determined that such activity was not an activity engaged in for profit. Alternatively, respondent contends that if petitioners' dog breeding activity is characterized as an activity engaged in for profit (a) certain expenses (travel and entertainment, maintenance and repairs, and cleaning) are personal in nature and hence not deductible and (b) an allocation is required between business and personal use for certain claimed depreciation expenses. OPINION Based on his contention that petitioner's dog breeding activities were not engaged in for profit, respondent has not allowed under section 183[5] the deductions claimed by petitioners for 1978, 1979 and 1980 relating to Shantoma. *120 Section 183(a) provides that, in general, an individual will not be allowed any deduction attributable to an activity if such activity is not engaged in for profit. Section 183(c) defines an activity not engaged in for profit as any activity that is either not deemed a trade or business for purposes of section 162 or not deemed to be for the production of income for purpose of section 212(1) or section 212(2). To establish that an activity is one engaged in for profit, petitioners must show that they engaged in the activity with an actual and honest objective of making a profit. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), affd. without opinion (D.C. Cir. 1983). The taxpayer's expectation need not be a reasonable one, but the profit objective must be bona fide. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra.In determining whether *121 the requisite intention to make a profit exists, greater weight is to be given to the objective facts than to the taxpayer's self-serving characterization of his intent. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. In making our inquiry as to whether Shantoma is an activity engaged in for profit we must analyze all the relevant facts that bear on the true nature of the activity. The income tax regulations list nine relevant, non-exclusive factors gleaned from pre-existing case law to aid in this inquiry. Sec. 1.183-2(b), Income Tax Regs. These factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer of his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the *122 activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. No one factor is conclusive in making the determination. Allen v. Commissioner,72 T.C. 28, 34 (1979). Petitioners request that we find that the expenses incurred by petitioners in their dog breeding activities for the years involved were incurred by them with the objective of making a profit. For the reasons set forth below, we are unable to make such a finding. Petitioners cite Engdahl v. Commissioner,72 T.C. 659 (1979), to support their position. In Engdahl, the taxpayers (an orthodontist and his wife) with substantial income embarked upon a horse breeding enterprise in contemplation of the husband's impending retirement. After having consulted with those already involved in horse breeding about how to operate a breeding activity, as well as the general business and economics of a breeding enterprise, they purchased horses in 1964 and boarded them at a stable. By 1967, to cut costs of boarding, they had purchased a ranch on which they would live and operate *123 their breeding activity. The Engdahls worked between 35 and 55 hours during the week in all facets of the operation, from building stalls, fences and irrigation facilities themselves to attending to the horses during horse shows. Although they occasionally attended social functions in connection with horse shows, their social life was not structured around the horse breeding community, nor did they view their involvement with the horses as anything more than a job, having no particular affection for horses. They maintained a single checking account for the horse operation, the orthodontic practice and personal expenditures, although all revenues from horse sales and stud fees were deposited into a separate savings account. Their books and records, which were maintained under the auspices of their accountant, were compiled and reviewed by the accountant quarterly and an annual summary recapitulation was compiled, with a breakdown of expenses for each month. The taxpayers in that case attributed their continued losses to the failure of the anticipated demand for their breed of horse to materialize, increased costs, the death of two horses (one of which was their most expensive *124 mare), and the less-than-zealous efforts of their trainer. In that case, we held that the taxpayers were not precluded by section 183 from deducting the expenses attributable to their horse breeding activity. Petitioners herein argue that they, like the taxpayers in Engdahl, have (1) maintained complete and accurate books and records; (2) attempted to change their operation to overcome losses incurred because of circumstances beyond their control; and (3) worked long hours to build a business which would sustain them in Dr. Burger's retirement. However, we do not find petitioners' arguments compelling. Petitioners did not approach and operate Shantoma as would one with a bona fide objective of making it a profitable enterprise, and we, therefore, hold that they were not engaged in dog breeding to make a profit. The extensive study or consultation with experts about an activity's accepted business and technical practices may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. Petitioners read numerous books and periodicals pertaining to the breeding *125 of dogs and consulted with individuals whom petitioners considered to be expert in the field, yet they embarked on the venture without any particular expertise and without consulting with any experts on the business end of the activity. While a formal market study is not required, a basic investigation of the factors that would affect profit is. Golanty v. Commissioner,72 T.C. 411, 432 (1979), affd. without opinion (9th Cir. 1981); compare Engdahl v. Commissioner,supra at 668. [6] They undertook the activity with no concept of what their ultimate costs might be, how they might operate at the greatest cost efficiency, how much revenues they could expect, or what risks could impair the generation of revenues.
That the taxpayer carried on the activity in a businesslike manner and maintained complete and accurate records may indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. *126 However, petitioners have failed to either operate in a businesslike manner or maintain adequate records. We do not base this finding, as respondent would have us do, on the fact that petitioners used a single checking account for both personal and dog breeding expenditures. Such a practice has already been found to be acceptable where, as here, proper notation is made distinguishing the various expenditures from each other. Engdahl v. Commissioner,supra.It is the annual posting of various income and expenditure items to a ledger of no real business value as done by petitioners that we find to be insufficient. The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner. Golanty v. Commissioner,supra at 430. The ledger maintained for Shantoma did not supply this information. It was compiled *127 only annually. It neither broke down the costs incurred by the month, as did the records maintained by the taxpayers in Engdahl, nor did it allocate the costs and overhead among the dogs maintained for sale to determine the profitability or break-even point for each. [7] We believe that if petitioners' primary objective was to achieve profitability of their operation they would have shown greater interest in monitoring the costs they incurred for Shantoma so that they could discover ways of reducing them. The ledger was completely inadequate for cost analysis. Petitioners assert that they lack the sophistication to implement such an involved bookkeeping process and the resources to hire someone who had such ability. Indeed, lack of business sophistication does not necessitate a finding of lack of profit objective, but the term "businesslike manner" contemplates the usage of cost accounting techniques that, at a minimum, provide the entrepreneur *128 with the information he requires to make informed business decisions. Without such a basis for decisions affecting the enterprise, the incidence of a profit in any given period would be a wholly fortuitous result. Furthermore, as Dr. Burger employed a sophisticated accounting system for his medical practice, he could have employed a similar system for Shantoma. Dr. Burger's office manager kept the Shantoma books as well as the medical practice books; she could have applied her skill as much to the one as she did to the other. Petitioners also point to their extensive records of pedigree, dog show accomplishments, potential breeding partners, and correspondence to buttress their claim that they maintained accurate records. However impressive the completeness of these files may be, they are as consistent with a hobby as with a business and therefore do nothing to support petitioners' position. Golanty v. Commissioner,supra at 430. Petitioners do not fare any better when we examine the operational results of Shantoma. The six consecutive years of losses (from 1975 to 1980) [8], the rate at which these losses grew, and the level which they reached, when *129 analyzed with respect to petitioners' inability to recoup these losses from operations, unrealized asset appreciation, or a combination of the two, supports our finding that Shantoma was not operated as an activity in which petitioners had a profit objective. A continuous series of losses during the start-up stage will not necessarily be deemed indicative that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, the cumulative losses should not be of such a magnitude that an overall profit (total revenues over cumulative expenses) from a combination of operations and realization of the appreciation in assets used in the business cannot possibly be achieved. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); see sec. 1.183-2(b)(4), Income Tax Regs.
Assuming, arguendo, that each of the years at issue falls within *130 the category of "start-up stage," the net cumulative losses by the end of each such year were so great ($134,473.30 by the end of 1978; $189,072.41 by the end of 1979; and $239.778.51 by the end of 1980) that petitioners could not have expected to realize a net overall profit during any of the years at issue from operations of from the sale of Shantoma's assets. Golanty v. Commissioner,supra;White v. Commissioner,23 T.C. 90, 94-95 (1954), affd. 227 F.2d 779 (6th Cir. 1955). The regulations provide that a series of losses beyond the start-up stage may be indicative of the absence of a profit motive unless such losses can be blamed on unforeseen or fortuitous circumstances beyond the taxpayer's control. Sec. 1.183-2(b)(6), Income Tax Regs. Although there were fortuitous circumstances beyond the control of petitioners, such as the delay in the breeding of Kunasata because of the inability of Dr. Kennedy to provide a stud and the ruptured uterus that Kunasata suffered, it was not shown that had these events *131 not occurred, Shantoma nevertheless would have been profitable. In the best of circumstances, were Kunasata to have whelped a litter of nine pups by the middle of 1977 and remained healthy [9], petitioners still would not have been able to surmount their already substantial losses [10] through the sale of such a hypothetical 1977 litter and all subsequent litters that might have been whelped by a healthy Kunasata. The unlikelihood that Shantoma's revenues could ever exceed its substantial losses militate in favor of a finding that petitioners did not possess a profit objective. Petitioners rely on their long hours and hard work, Sec. 1.183-2(b)(3), Income Tax Regs., their preference not to socialize within the dog business community (doing so only when it would help "business"), and the fact that they had no particular affection for the dogs as sufficient evidence *132 that their motive must have been to make a profit. Engdahl v. Commissioner,supra at 670-671. Accepting arguendo petitioners' self-serving statements that they devoted both long hours and substantial energy to the enterprise, we believe that such dedication was motivated by their desire to obtain recognition in the dog breeding community, i.e., by breeding winners. While petitioners were testifying, we observed each derived gratification and pride from the success of their dogs. Unquestionably, an enterprise is no less a "business" because the entrepreneur gets satisfaction from his work; [11] however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity. Bessenyey v. Commissioner,supra at 275. "The gratification derived from an occupation worth doing, possibly beneficial to others, and probably requiring long hours of arduous labor must still ot be confused with an intention to *133 return a profit." White v. Commissioner,23 T.C. at 94. The high costs of deriving such personal gratification were offset by the deductions claimed by petitioners. Due to Dr. Burger's substantial income from his medical practice and his employment with Alcoa, petitioners' marginal tax rate, before Shantoma's losses, was high enough (62% in 1978, 64% in both 1979 and 1980) that the deduction of the expenses of Shantoma resulted in a reduction in their tax liabilities during *134 the years in issue sufficient to offset most of the losses incurred. This, in essence, afforded petitioners the opportunity of engaging in an expensive hobby while the government subsidized most of the costs. Engdahl v. Commissioner,supra at 670; Golanty v. Commissioner,supra at 429. Petitioners claim that their financial status once Dr. Burger retires must be considered, rather than their current financial status. We do not agree since the tax benefits at issue herein are a function of current income (cf. Engdahl v. Commissioner,supra at 670). In the final analysis, we are not able to find that petitioners exercised the vigilance necessary to keep costs to a level which would make the realization of a profit possible. The speed at which petitioners' losses from Shantoma mounted, the magnitude of the losses, the duration over which they accumulated, the improbability that Shantoma would ever yield an overall profit, and the tax benefits derived by petitioners make clear that Shantoma was not an activity in which petitioners engaged with a bona fide objective of making a profit. Accordingly, petitioners may *135 not deduct any expenses incurred with respect to Shantoma, other than those allowed under section 183(b). Having found that petitioners' dog breeding activity was an "activity not engaged in for profit" within the purview of section 183, we need not address respondent's alternative position. Accordingly, Decision will be entered for respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
2. Dr. Burger had owned thoroughbred horses as an absentee owner for three years during the early 1960's but abandoned that venture when the losses got unwieldy and he realized that his input and control of the operation was limited. ↩
3. In discussing the breeding of dogs with breeders, petitioners did not discuss the financial hazards involved. ↩
4. Petitioners' residence was located in a zone restricted to single family houses.↩
5. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal o the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.↩
6. Steele v. Commissioner,T.C. Memo. 1983-63↩ (a "little feasibility study" is not sufficient).
7. See, e.g., Ballich v. Commissioner,T.C. Memo. 1978-497; Steele v. Commissioner,T.C. Memo. 1983-63↩.
8. Shantoma sustained losses for 1981 ($50,898.18), 1982 ($15,114.00) and 1983 (amount not specified in the record).↩
9. It was not until March of 1977, when petitioners were ready to breed Kunasata following her wins at the National Speciality Show and the Westminster Kennel Club Show, that matters could be said to have been taken out of their control. ↩
10. By the end of 1977, the losses exceeded $88,000.↩
11. It does seem to me that if a man does not expect to make any gain or profit out of the management of the farm, it cannot be said to be a business for profit, and while I should be the last to say that the making of a profit was not in itself a pleasure, I hope I should also be one of those to agree there were other pleasures than making a profit. Indeed, it makes no difference whether a man is engaged in a business which gives him pleasure, if it be a business * * *. But it does make a difference whether the occupation which gives him pleasure can honestly be said to be carried on for a profit. Thacher v. Lowe,288 F. 994, 995 (S.D.N.Y. 1922) (Learned Hand, J.↩).