T.C. Memo. 2021-25

UNITED STATES TAX COURT

JOSEPH A. GALLEGOS AND JOY K. GALLEGOS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11003-14.                     Filed March 2, 2021.

John Edward Leeper, for petitioners.

Sheila R. Pattison, Bryan J. Dotson, Bruce K. Meneely, and Abbey B.
Garber, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: Joseph Gallegos was making a very good living from his
insurance business when he decided to devote a very large chunk of his time to
team roping. This cost him tens of thousands of dollars, some of which he put on
the same Schedule C, Profit or Loss From Business, as his insurance business.
The Commissioner says these are personal expenses and disallowed them.

[*2]                    FINDINGS OF FACT

Gallegos grew up on the largest ranch in Albuquerque, New Mexico, and he learned his way around horses at a very young age.  But it wasn't on horses that he rode to success.  After graduating from high school in 1980, he began to sell health and life insurance.  He didn't find it easy, and he and his wife relied on her job at a marketing research firm to make ends meet for their family.  But then he had an excellent idea--he and his wife started up a field marketing organization, West Texas Brokers, Inc.  Their field marketing organization "basically * * * specialize[s] in what is called Medicare Advantage."  This was a relatively new area of the insurance business, and Gallegos came up with a way to hire and train field agents to represent insurance companies and sell their policies in new markets:  His agents earn commissions when they make sales and the Gallegoses' business shares in their success through override commissions.

The business was a galloping success.  Gallegos proved exceptionally talented at spotting people with promise and, once he roped them into a training program and then let them loose in the market, he could share the commissions that they brought in.  He was able to slow down his day-to-day operations, as much of the work could be delegated to his wife and other members of his family.  And though the Gallegoses credibly testified that the insurance market could be

**[*3]** "extremely volatile," the business did well. It earned a net profit of just over $360,000 in 2009 and close to $500,000 in each of the two years that followed. With some extra time on his hands, and (he says) concerns about his continued success in the industry, Gallegos decided to focus his energy on team roping.

## A.    Team Roping

Gallegos started competing in team-roping competitions in 1989. He had been somewhat "around it" as a child but received a more formal introduction when he bought a horse from a team-roping "producer".[1] Gallegos at first intended to use the horse to cover more ground while deer hunting, but once he tried team roping he was hooked. Or maybe lassoed.

### 1.    Team Roping for the Equine Challenged

Team roping is an event taken from professional rodeo (though "not a rodeo event itself"), but its origins can be traced back to the Old West "when cowboys needed to treat or brand steers too large or difficult for one man to handle alone." Team Roping, Silver Spurs Rodeo, https://www.silverspursrodeo.com/team-roping/ (last visited Sept. 4, 2020). It "evolved into a sport when a couple of cowboys somewhere, many years ago, turned a common ranching procedure into

---

[1] A producer in this industry is someone who "buys and sells rope horses and puts on team roping."

[*4] competition." John Findlay, <u>Team Roping Basics</u>, United States Team Roping Championships, https://www.ustrc.com/Knowledge/Roping101/index.asp (last viewed Sept. 4, 2020). It requires coordination and timing between two cowboys, the "header" and the "heeler". <u>Id.</u> Gallegos is a header, and his job is to "rope just what it says, the head of the cow or the steer." Then there's the heeler who, after the header has roped the head, comes from behind to rope the two back feet. Both cowboys then "dally", or wrap, the rope around the horns of their saddles to pull the ropes taut and stop the steer. Once the cowboys face each other with the steer in the middle, a flag is dropped and time is called. The fastest team wins. (We acknowledge that this is a very simplified explanation. There are a multitude of rules on timing, positioning of the riders, and "legal head captures.")

Team roping has gotten big enough to become its own event, completely separate from rodeo, and is done all over the world--though it remains most popular in the United States. Much of the sport's growing popularity is due to the founding of the United States Team Roping Championships (USTRC), the United States' primary roping association. The USTRC was founded in 1989 to provide a classification system that matches ropers in competitions based on their skill levels, instead of having just one big "open division" where ropers of all skill levels compete against each other.

**[*5]**    Under the classification system, ropers are rated on a scale of 1 to 10, with 10 being the most highly skilled.  Roping is a team sport, and team ropers can enter competitions based on their combined rating (e.g., a 5-rated header and a 6-rated heeler can enter an "11 Division," etc.).  Gallegos is rated a "5-5+", and most of the some 80,000 members of the USTRC are handicapped at a five or lower.  This classification system was huge, because it allowed for more competition and a larger spread of winnings.  The sport is pay-to-play and requires fairly hefty entry fees--fees that have increased with the popularity of team roping.[2]  You therefore "have to be prepared if you're going to put that kind of investment in."  And the goal is to perform well enough to at least win back your entry costs.[3]

There are many costs in addition to entry fees--ropers have to pay for their own travel, a trailer or truck for their horses, and the horses themselves.  It is not an inexpensive undertaking.

---

[2] One odd, but foreseeable, consequence is that there is much more money to be made if you are an average roper, because there are more ropers in this skill level.  For example, a 5-rated roper has more flexibility to team up with other similarly ranked ropers (4, 5, 6, 7) and enter more ropings than say, a 9-rated roper who has fewer competitors and thus a smaller pool of money.

[3] Gallegos testified that at certain competitions, the first place team in the Number 10 Division could win as much as $275,000, to be split between the two team ropers.  Prize money may be awarded as low as the 40th-place team, where team members could still collect around $3,000 each.

[*6]    2.    <u>Gallegoses' Team-Roping Business Plan</u>

Gallegos had been team roping for years, but it wasn't until 2009 that the Gallegoses began reporting income and loss from it on the Schedules C of their joint income tax returns.

The Gallegoses argue that it was only then that Gallegos decided to make it his business and not just his pastime. According to them, they were worried that West Texas Brokers would not be as successful as it ultimately turned out to be. According to Mrs. Gallegos they began contemplating another business venture in 2008, and even considered buying a Subway franchise. But neither of the Gallegoses had restaurant experience, and team roping looked better. Gallegos said that "since I had the expertise * * * and [because of] the way that the [team roping] industry changed so much and gave us this opportunity, we decided to make it a business."

Their "business plan" was simple: They would earn a profit by having Gallegos "get better" at team roping, by winning team-roping competitions, and also by selling (and possibly breeding) successful team-roping horses. In Mr. Gallegos's own words, he "wanted to get better, put more effort into it, more time into it, and win." The values of horses "were a main part" of this plan, and the Gallegoses claim to have even bought a mare--in addition to their three other

[*7] horses, "W", "Rush", and "Hannaty"--for "the sole purpose of breeding."[4] But winning was key to making the horses more valuable. "Getting better" also included having the proper equipment, such as a nice saddle and luxury horse trailer that would enable Gallegos "to go to [the] next level." The trailer came complete with living quarters, which Gallegos says ultimately saved him lodging and food expenses while away at roping competitions.

We summarize the success of their plan during the years at issue:

|  | 2009 | 2010 | 2011 |
| --- | --- | --- | --- |
| Gross receipts | $11,276 | $33,391 | $40,456 |
| Expenses: | | | |
| Depreciation | 9,180 | 31,878 | 23,060 |
| Supplies | 8,150 | --- | --- |
| Meals and entertainment | 270 | --- | --- |
| Car and truck | 3,225 | 3,225 | 4,031 |
| Entry fees | 45,140 | 42,380 | 51,615 |
| Travel | 538 | --- | --- |
| Rent/lease of other business property | --- | 12,000 | 14,000 |
| Shoeing | --- | 580 | --- |

--------

[4] The horse he refers to suffered a head injury at some point and had to be put down. Horse W was purchased in 2009, while horses Rush and Hannaty were bought before this, in 2006 and 2008.

| [*8] Net profit | (55,227) | (56,672) | (52,250) |
|---|---|---|---|

One can see that the Gallegoses did not make a profit during any of the years at issue. They also did not maintain a separate bank account or records for their team-roping activity, and had no budget for it either.

Like a mountain lion sniffing out a herd of mustangs, the Commissioner detected this consistent pattern of losses and began circling his prey.

B.      Reporting, Audit, and Trial

He first noticed that the Gallegoses inaccurately reported their 2009 team-roping income and expenses. They underreported the large entry-fee expense of $45,000 by around $6,000; underreported their gross receipts by about the same amount; and failed to claim deductions for car and truck expenses, travel, and meals. What they reported for 2010 and 2011 was only slightly different from their true expenses, but still inaccurate across nearly all reported items. And they incorrectly reported certain of these amounts on the same Schedule C as they did their West Texas Brokers items of income and expense for 2009.[5] These team-

_____

[5] The Gallegoses filed a separate Schedule C for their team roping as "Rodeo Perfomer," yet reported certain team-roping expenses on their Schedule C for West Texas Brokers. Taxpayers must file a separate Schedule C for each of their unrelated business activities, see Shah v. Commissioner, T.C. Memo. 2015-31, at *38, and cannot combine two activities for the purpose of hiding a loss from

(continued...)

**[*9]** roping losses helped to offset income from West Texas Brokers, particularly in 2010 and 2011 when that firm was so successful.

The Commissioner sent the Gallegoses a notice of deficiency in which he disallowed their team-roping expenses. The Gallegoses timely petitioned our Court, and we tried their case in El Paso.[6] The parties settled many issues, and left us to decide only whether the Gallegoses engaged in team roping with the intent to earn a profit in 2009-11.

## OPINION

The parties argue as one would expect. The Gallegoses say that, starting in 2009, they only ever intended to make a profit. They say Mr. Gallegos was competing in a sport where he was likely to win and he had a business plan to improve and win some more. The Commissioner argues that any hope for an

---

[5](...continued)
one of the activities. The Gallegoses continued to commingle the team-roping income and expenses with the income and expenses of West Texas Brokers even after they elected in 2011 to make West Texas Brokers an S corporation and began reporting on Forms 1120S, U.S. Income Tax Return for an S Corporation.

[6] The Gallegoses lived in Texas at all relevant times, which means any appeal would presumptively go to the Fifth Circuit. See sec. 7482(b)(1)(A). (All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.)

[*10] ultimate profit is saddled with the weight of so many improbabilites that it could not reflect a genuine profit motive.

Section 162(a) permits deductions for "ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." And section 212(1) and (2) generally allows a taxpayer to deduct all the ordinary and necessary expenses paid or incurred "for the production or collection of income," and "for the management, conservation, or maintenance of property held for the production of income." Even if there is no trade or business, a deduction for expenses relating to investment activities may be allowable under section 212. See, e.g., Thomason v. Commissioner, T.C. Memo. 1997-480, 1997 WL 653894, at *6. But section 183(a) bars taxpayers from claiming deductions for activities that are "not engaged in for profit," except as provided under section 183(b).

The test of profit motive is a subjective one--a taxpayer must show that he undertook the challenged activity with an "actual and honest objective of making a profit." See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983). His expectation of profit doesn't have to be reasonable, but it must be genuine. See sec. 1.183-2(a), Income Tax Regs. ("[I]t may be sufficient that there is a small chance of making a large profit"); see also Elliott v. Commissioner, 90 T.C. 960, 970 (1988), aff'd without

[*11] published opinion, 899 F.2d 18 (9th Cir. 1990). A taxpayer bears the burden of proving his motive, which must be to make an economic profit and not just to cut his tax bill. Westbrook v. Commissioner, 68 F.3d 868, 876 (5th Cir. 1995), aff'g T.C. Memo. 1993-634, 1993 WL 540784. And, in the Fifth Circuit, the intent to make a profit must be his primary motive. Id.

Did the Gallegoses intend to make a profit from team roping? The regulations give us some direction.[7] They say to use "objective standards" to discern a taxpayer's intent, "taking into account all of the facts and circumstances." Sec. 1.183-2(a), Income Tax Regs. They give us nine factors to consider, with "[n]o one factor [being] determinative." Id. para. (b). They tell us that we can look at other factors not on the list and that we should not make a determination based on the number of factors indicating a lack of profit motive and "vice versa." Id.

---

[7] Section 183(d) has a safe harbor for an activity consisting in major part of breeding, training, showing, or racing horses. Such an activity will be presumed to be engaged in for profit if the activity produces gross income in excess of deductions for any two of the seven consecutive years which end with the tax year, id., unless the Commissioner establishes to the contrary, Donoghue v. Commissioner, T.C. Memo. 2019-71, at *23. The Gallegoses' team roping produced no gross income in excess of deductions during the years at issue. They also haven't shown us that it did in any of the years that followed. See sec. 7491(a). This presumption does not apply.

[*12] This case, however, is appealable to the Fifth Circuit, and so we'll use the nine-factor test. Here are all nine:

- the manner in which the taxpayer carries on the activity;

- the expertise of the taxpayer or his advisers;

- the time and effort expended by the taxpayer in carrying on the activity;

- the expectation that assets used in the activity may appreciate in value;

- the success of the taxpayer in carrying on other similar or dissimilar activities;

- the taxpayer's history of income or losses with respect to the activity;

- the amount of profits earned, if any;

- the financial status of the taxpayer; and

- any elements of personal pleasure or recreation.

Id. We'll look at each one in turn with the help of some precedents, including a couple of cases involving team roping that our own research wrangled for this opinion. See Estate of Brockenbrough v. Commissioner, T.C. Memo. 1998-454, 1998 WL 898107; Haun v. Commissioner, T.C. Memo. 1998-349, 1998 WL 712821.

**[\*13]** A.     Manner in Which the Activity Is Conducted

The first factor has us look at how the taxpayer carries on the activity.  A taxpayer who works in a "businesslike manner" and "maintains complete and accurate books and records" is more likely to have a profit motive.  Sec. 1.183-2(b)(1), Income Tax Regs.  We can also find a profit motive "where an activity is carried on in a manner substantially similar to other activities of the same nature *which are profitable*."  Id.  (emphasis added.)  The Gallegoses say that they kept accurate books and records and "carried on the team roping activity in a manner substantially similar to successful team ropers."  To support this they point to Mr. Gallegos's weight loss and his rigorous practice schedule, as these factors would improve his performance, and in turn, allow him to win more often.

We do find that Mr. Gallegos showed considerable discipline and commitment to the sport, but as the Commissioner points out, there are problems with this argument.  First, the Gallegoses did not maintain complete and accurate books and records.  They never created a budget for team roping, and they didn't keep track of the money flowing into and out of the activity.  Specific proof of this is their largely inaccurate reporting of their 2009 team-roping expenses, and similar inaccuracies for 2010 and 2011.  Without adequate recordkeeping, it would be quite difficult for the Gallegoses to evaluate economic performance and ways

**[*14]** to improve profitability.  See Burger v. Commissioner, T.C. Memo. 1985-523, 50 T.C.M. (CCH) 1266, 1271, aff'd, 809 F.2d 355 (7th Cir. 1987).  The Gallegoses must have known how to keep good records, because they've kept and used adequate records for their insurance business; a business that is quite successful.  And contrary to what they argue, we don't think the USTRC's tracking of its members' entry fees and winnings suffices inasmuch as entry fees are far from the only major expense a team roper incurs.

We also bridle at finding the Gallegoses' business plan credible.  In both their testimony and briefs, the Gallegoses have convinced us that the sport's handicapping system means there is a greater financial benefit to keeping one's skills at somewhere in the lower-to-average range because there were more competitors and thus bigger pots at those levels.  The Gallegoses' business plan--which focused on improved performance[8]--is therefore at odds with improved profitability.  If it worked, Gallegos would jump into a higher skill level with lower earnings.  Given what the record shows, team roping is the unusual activity in which the route to profitability might more clearly lie in staying mediocre and

---

[8] Gallegos planned to see improved performance through daily practice (sometimes twice a day), practicing "with much higher rated team ropers," accepting advice from and picking the brains of experts, "attend[ing] schools," and studying practice runs.

**[*15]** attending as many competitions as possible, not to "go to the next level," as Gallegos says.

We also think that "winning"[9] without more is not a very believable business plan, especially when the Gallegoses claim to have entered the team-roping business because of the insurance market's volatility. If they were looking for a safer investment, they haven't found it in winning a team-roping competition here and there. Cf. Estate of Brockenbrough, 1998 WL 898107, at *10 (finding profit motive in operating a rodeo with team roping as one event). And many of the experts identified by the Gallegoses as individuals carrying on a similar activity do not (and cannot) rely on winnings to earn a profit; they have careers in horse training or selling team-roping equipment. We find that "winning" team-roping competitions is more of a hope than a real business plan. See Kneels v. Commissioner, T.C. Memo. 2017-152, at *15.

This factor weighs against the Gallegoses.

---

[9] The Gallegoses claimed that selling horses was another part of their plan to make a profit, but they said that this also hinged on winning: "[T]he more you win on that horse, the more the value of that horse goes up." There is nothing in the record, however, to suggest that the Gallegoses have ever sold a horse or even offered one for sale. The closest thing to an actual sale that the Gallegoses can point to is the purported offer they received of "over 20[,000]" for one of their roping horses. They turned it down because they said "he's more valuable for [them] at that price."

**[\*16]** B.     <u>Expertise of Taxpayers or Advisers</u>

This factor tells us that "[p]reparation for the activity by extensive study of its accepted business, economic, and scientific practices" or consultation with experts can suggest a profit motive.  Sec. 1.183-2(b)(2), Income Tax Regs.  While "a taxpayer needn't make a formal market study in preparation for a trade or business, he's expected to undertake a basic investigation of the factors that would affect his profit."  <u>Heinbockel v. Commissioner</u>, T.C. Memo. 2013-125, at \*24-\*25 (citing <u>Westbrook v. Commissioner</u>, 1993 WL 540784, at \*7).  Technical "knowledge of the activity itself apart from its economics" is insufficient.  <u>Metz v. Commissioner</u>, T.C. Memo. 2015-54, at \*44.

The Gallegoses say that Mr. Gallegos is "an expert horseman."  They also point to the fact that he "rates team ropers for the USTRC," and consults with "some of the best team ropers in the business."  We recognize that Gallegos has a good deal of experience with horses generally, but this is not the type of expertise required by the regulations.  The Gallegoses haven't shown that they sufficiently considered the *economics* of team roping, even if Mr. Gallegos has great knowledge of its technical aspects.  They "made no financial projections with regard" to team roping or horse breeding, and they did not "estimate the return of capital invested in these activities."  <u>Westbrook</u>, 68 F.3d at 878.

[*17] They didn't even make a budget for themselves and their purported business plan aimed to improve Mr. Gallegos's skill level at the expense of profitability. Consulting with some of the best team ropers is likewise insufficient when winning team-roping competitions isn't really even their business. Favoring technical knowledge over practical knowledge of an activity's economics reveals a skilled hobbyist and not a businessman. See Golanty v. Commissioner, 72 T.C. 411, 432 (1979), aff'd, 647 F.2d 170 (9th Cir. 1981).

This factor favors the Commissioner.

C.   Time and Effort Expended on the Activity

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs. And a taxpayer's choice to leave another job to spend most of his time on the activity may be very convincing evidence of his intention to turn a profit. See id.; see also Metz v. Commissioner, at *46-*47. We're convinced here that Gallegos devoted a significant amount of time to team roping. He traveled to three roping competitions a month and practiced several hours a day, twice a day at times, even when he just wanted to "sit * * * and watch 'The Big Bang Theory' and eat some potato chips." This is all on top of his daily

[*18] chores, which include feeding, watering, and washing his horses, and mucking out their stalls.

But we find that Gallegos's practices and competitions had "substantial personal or recreational aspects," see Dodge v. Commissioner, T.C. Memo. 1998-89, 1998 WL 88175, at *5-*6) (finding the time and effort factor neutral for taxpayers who "also derived substantial recreational benefit from the time they spent with their horses"), aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999), even given the work associated with it, see Giles v. Commissioner, T.C. Memo. 2006-15, 2006 WL 237503, at *13 ("[U]npleasant tasks associated with caring for horses are required regardless of whether the activity is pursued as a hobby or a business"). There's no way team roping doesn't have substantial personal and recreational aspects to Mr. Gallegos. He himself considered it a hobby from 1989 up until the years at issue and even gave up his beloved deer hunting for the sport. While he did slow down his work with West Texas Brokers, it was not to the detriment of that business. See Metz, at *46-*47. Even so, we think the time he put into team roping, though not insignificant, could be done around a normal work schedule and is in line with his lifetime enjoyment of horses. See Haun, 1998 WL 712821, at *6.

This factor is neutral.

**[*19]** D.     Expectation That Assets Used in Activity May Appreciate in Value

An expectation that assets will appreciate in value can suggest a profit motive even if the taxpayer derives no profit from current operations. See sec. 1.183-2(b)(4), Income Tax Regs. The Gallegoses claim that aspects of their business plan were to "increase[] the value of [their] horses by winning," as well as "breeding, raising, and selling team roping horses." They say that Mr. Gallegos was once offered $20,000 for a horse that he bought for $11,000, but highly skilled roper Wayne Baise says there's more money to be made than that. Wayne Baise says that he's sold a roping horse for $50,000.

But we can infer a profit motive here only if the Gallegoses expected that the horses' appreciation would exceed their team-roping operating expenses, such that the eventual gain on sale would allow them to recoup their losses.[10] See Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 WL 129803, at *8, aff'd, 591 F. App'x 625 (9th Cir. 2015); sec. 1.183-2(b)(4), Income Tax Regs. The Gallegoses have not demonstrated, or really even argued, that they ultimately expect horse sales to help offset their losses; losses that are over $150,000 for the

---

[10] We consider the Gallegoses' holding (and maybe breeding) horses for investment and team roping as one single activity for purposes of determining appreciation of assets, as they're inextricably linked. See sec. 1.183-1(d)(1), Income Tax Regs.

[*20] three years at issue. And we have no way of knowing whether one of the Gallegoses' own horses would also sell for $50,000 without some sort of formal appraisal. The record has none of these.

This factor favors the Commissioner.

E.     Success in Carrying On Other Similar Activities

A taxpayer's previous success in similar activities may show that he has a profit objective, even if the activity is currently unprofitable. See sec. 1.183-2(b)(5), Income Tax Regs. The Gallegoses say they win on this factor because of the success they've had with their insurance business. They say that the hard work Mr. Gallegos put into his insurance business over many years to make it profitable is the same as the hard work he is currently putting into team roping. They say it may not be profitable now, "but the rewards are going to be huge."

As the Commissioner points out, however, the Gallegoses do not even apply to team roping many of the sound and customary business practices they apply to the insurance business, such as having a separate bank account and an effective recordkeeping system. Gallegos has shown a willingness to adapt with his insurance business: He switched from selling life and health insurance to Medicare Advantage. But we see no similar willingness to move out of this money-losing activity. He has increased the time he's spent on team roping over

**[*21]** the years, but that's not the same--his increased effort has led him only to lose money at a gallop instead of a trot. The Gallegoses have therefore failed to show that their success in the insurance business has helped them to make Mr. Gallegos's team roping profitable.

This factor favors the Commissioner.

F.      History of Income or Loss

A series of losses during the startup stage of an activity may not necessarily prove that an activity is not engaged in for profit. See sec. 1.183-2(b)(6), Income Tax Regs. "However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status," losses may indicate that the activity was not undertaken for profit. Id. The Gallegoses reported total losses from team roping of more than $150,000 for the years at issue. But Gallegos has been team roping competitively since 1989 and never once earned a profit.

The Gallegoses don't address the 20 unprofitable years leading up to 2009, but say that the years at issue were the startup phase of their team-roping business. They contend that, as section 183(d) points out, they need to have only 2 out of 7 profitable years, and so these were just their unprofitable years. Their argument seems to be that they didn't make a profit in earlier years because Mr. Gallegos

[*22] didn't have the right equipment (a trailer with living quarters, a new saddle, and new horses), but then blame their lack of profit during the years at issue on these very purchases. They then proceed to contradict themselves and blame their losses on entry fees, which are "by far the most significant expense" and unavoidable if they want to win big. We don't find any of these arguments to be persuasive--and if entry fees are here to stay, we don't see how they support an argument that they are in any way peculiar to a startup phase. We also found telling the absence of any claimed deductions for provender or boarding or veterinary expenses. Gallegos testified that he "was doing all that myself," but we find that putting on blinders to such expenses doesn't make them disappear. And it doesn't make a money-losing activity lose any less money.

We also find the Commissioner's argument--that Gallegos decided to spend more on team roping, and use its losses to offset other income only once his insurance business started blossoming--a more plausible one.

This factor also favors the Commissioner.

G.    Amount of Occasional Profits, if Any

Occasional profits can show a profit motive, but the size and frequency of profits relative to losses are what matter. See sec. 1.183-2(b)(7), Income Tax Regs. And "[a]n occasional small profit from an activity generating large losses,

[*23] or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." Id. The Gallegoses had regular losses from team roping and only occasional small winnings. The most Gallegos won at a roping competition during the years at issue was $3,890. And though his total winnings did go up in the years at issue ($11,276, $33,391, and $40,456, respectively), his associated expenses also went up (though we recognize some of this was noncash depreciation), leaving his cumulative net loss mired at around $50,000. We find that this is not a situation where there is a "substantial profit" to be made and "the investment or losses are comparatively small." See id. Even if Gallegos happens to win big and make a substantial profit once in a great while, his investment in team roping is not comparatively small. The same is true for any potential sale of a horse.

This factor favors the Commissioner.

H.   Taxpayer's Financial Status

A taxpayer's lack of "substantial income or capital from sources other than the activity [at issue] may indicate that [the] activity is engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs. The Gallegoses admit that their insurance business has been successful, but they worry about its continued success. They may be right, but we cannot ignore that they received substantial income from it of

**[\*24]** just under $400,000 in 2009 and around $500,000 in 2010 and 2011.  Here's a chart showing the Gallegoses' split of income:

| Income | 2009 | 2010 | 2011 |
|---|---|---|---|
| West Texas Brokers | $360,298 | $575,129 | $498,504 |
| Team roping | (55,227) | (56,672) | (52,250) |

The years that followed saw similar substantial income from West Texas Brokers-- income that would have been greater had it not been offset by the team-roping expenses reported on the same schedules.

This factor weighs heavily in favor of the Commissioner.

I.     Elements of Personal Pleasure or Recreation

This leaves one last factor.  "The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved."  Sec. 1.183-2(b)(9), Income Tax Regs.  Mr. Gallegos admits that he enjoys team roping, but says Mrs. Gallegos does not.  He also says that the horses "are not ridden for pleasure," but rather are "business assets" that are for sale.  He says that team roping "is extremely hard work, time consuming, physically demanding and often times flat out gross."  But many hobbies can take a lot of time and energy while still being mostly a source of personal recreation.  See Betts v. Commissioner,

[*25] T.C. Memo. 2010-164, 2010 WL 2990300, at *9. We also aren't convinced that someone who grew up around horses would find the work "gross".

Gallegos had been team roping as a hobby for nearly 20 years before the years at issue, and this leads us to find that he derives a significant amount of personal pleasure from it, even if he can also make some money doing it. See Burger v. Commissioner, 50 T.C.M. (CCH) 1266, 1272-73 ("[W]here the possibility for profit is small * * * and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity"). He doesn't participate in any substantial way in any other recreational activities, Gallegos gets a tremendous amount of satisfaction going to competitions, meeting top-ranked ropers, and winning a bit of his own fame.

This factor favors the Commissioner.

J.    Conclusion

We find that the Gallegoses did not participate in team roping with the primary motivation to earn a profit. Even for a court like the Seventh Circuit that's broken free from the regulation's factors, see Roberts v. Commissioner, 820 F.3d 247, 250, 254 (7th Cir. 2016) (open-ended test of objective factors of subjective intent "goofy"), rev'g T.C. Memo. 2014-74, a holistic approach would wind up in the same place. The Gallegoses were earning a large income. Mr.

[*26] Gallegos had been team roping for a long time as a hobby before the years at issue.  Their business plan was built around "winning".  And the realities of the sport meant that team roping was never going to be a stable source of income for them, especially given its costs.  The Commissioner wins on this issue, and

<u>Decision will be entered under</u>

<u>Rule 155</u>.